UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| DEBRA COHEN TUDOR,<br><br>         Plaintiff,<br><br>    v.<br><br>ANDREW M. SAUL,<br><br>         Defendant. | Case No.  19-cv-03050-RMI<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMET**<br><br>Re: Dkt. Nos. 26, 29 |

Plaintiff, Debra Cohen Tudor, seeks judicial review of an administrative law judge ("ALJ") decision denying her application for disability insurance benefits under Title II of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 7 & 10), both parties have moved for summary judgment (dkts. 26 & 29), and both parties seek a remand to the ALJ. While Plaintiff seeks remand for the immediate calculation and payment of benefits, Defendant confesses error but seeks a remand for further proceedings.

**BACKGROUND**

Plaintiff, who is now 56 years old, began her career by earning various advanced degrees in biomedical sciences and electrical engineering from institutions such as Harvard and MIT. *See AR* at 226, 326; *see also* Pl.'s Mot. (dkt. 29) at 6. Thereafter, Plaintiff spent the better part of 20 years working in highly specialized positions for employers such as Micron Semiconductor Products and the Intel Corporation. *Id.*; *see also AR* at 222-25. Starting in September of 2014,

Plaintiff developed a severe migraine illness that caused progressively worsening and debilitating headaches at a frequency of 10 to 20 days per month, and which precluded her ability to function in the workplace at all. *See* Pl.'s Mot. (dkt. 29) at 6. As described in her Title II application, Plaintiff's chronic migraines caused her to experience various symptoms including dizziness, fatigue, problems with balance, diminished stamina, tremors, insomnia, nausea and vomiting, pain and pressure in her eyes, as well as sensitivity to sound and light (and a consequential need to rest in a quiet and dark room). *AR* at 247. In the initial and reconsideration stages of evaluating her application, two non-examining consultants (Drs. Ligon and Kiger) found her migraine illness to be severe, however, they both maintained that there was insufficient evidence to evaluate the claim given that the record before them contained "no indication that there [was] a medical opinion from any medical source." *Id*. at 127, 136-37. However, prior to the hearing before the ALJ, Plaintiff supplemented her application with voluminous medical records from her treatment providers. *See id*. at 346-1491.

Plaintiff's more recent primary care provider, Suzanne Sims, M.D., submitted a medical source statement regarding the migraines and their effects on her ability to function. *Id*. at 1458-84. Initially, Dr. Sims noted that she had been treating Plaintiff for well over two years, with a frequency of treatment sessions every two to four weeks. *Id*. at 1471. Noting that Plaintiff's migraine illness resulted in severe headaches as often as 10 to 20 days per month, Dr. Sims opined that the migraines were triggered by hormone imbalances, and that the resulting headaches were exasperated by weather changes, allergies, stress, low blood sugar, insomnia, dehydration, and sensitivities to light, sounds, and odors. *Id*. Dr. Sims opined that Plaintiff's illness had lasted longer than 12 months, and that it could be expected to continue as such because the condition was resistant to treatment and also because emotional factors (depression and anxiety) contributed to its severity. *Id*. Given the severity of the migraine illness, and the lack of success in effectively treating it with medical intervention, Dr. Sims concluded that Plaintiff would be off-task more than 25% of the time in any work setting, and that Plaintiff could be expected to be totally incapacitated when suffering from the effects of her migraine illness. *Id*. at 1473, 1475. Consequently, Dr. Sims stated that Plaintiff should be expected to be absent from work for 5 or

more days per month due to the need for ongoing medical treatment; and further that she would be unable to complete a normal 8-hour workday due to her symptoms on 5 or more days per month. *Id*. at 1477. During Plaintiff's migraine flare-ups, which would occur between 10 and 20 days per month, Dr. Sims noted that Plaintiff would need to take unscheduled breaks, averaging 6 hours each, due to pain, nausea, vomiting, and the adverse effects of her medication. *Id*. at 1483. Lastly, noting that there had been no indication of malingering, Dr. Sims opined that the above-described limitation began in September of 2014. *Id*. at 1477.

In May of 2018, Plaintiff appeared for a hearing before the ALJ. *See id*. at 100-120. In pertinent part, Plaintiff testified that after a lengthy career in the engineering field, she experienced a precipitous decline in her health in September of 2014 as a result of the worsening of her migraine illness which rendered her unable to return to work. *Id*. at 106-07. Starting in September of 2014, Plaintiff's preexisting migraine illness increased in both intensity and frequency such that her symptoms were present between 10 and 20 days per month with pain levels ranging from 7 to 10 on a scale of 1 to 10. *Id*. at 107-09. On most occasions, Plaintiff would wake up with such a migraine, and if the first round of medication was effective (roughly 60 to 70 percent of the time), the pain would diminish after three or four hours; however, the remaining 30 to 40 percent of the time, when the first round of medication was ineffective, Plaintiff's pain would not diminish enough for her to be functional until an additional two to three hours had passed. *Id*. at 110-111. Further, there were still occasions when even the second round of medication did not dull her pain enough to render her able to get out of bed. *Id*. at 111. Given the debilitating effects of the migraines, as well as the side effects of her medications, Plaintiff was generally limited to light chores around the house; and, when the effects of her daily medications had worn off, she was able to occasionally go out in public later in the afternoon. *Id*. at 112. Plaintiff also testified that, in addition to pain, her migraines also cause nausea and that her anti-nausea medication causes her to be so drowsy that it renders her incapacitated for between 8 and 10 hours. *Id*. at 115-16. Despite her doctors taking a trial and error approach with various medications between 2014 and 2018, Plaintiff's symptoms largely remained the same. *Id*. at 116. Lastly, near the end of the hearing, the vocational expert ("VE") testified that if Plaintiff were likely to miss as little as four days of work

3

in an average month, she could neither perform her past relevant work, nor any other work that might be available in the national economy. *Id*. at 119-20.

Three months later, in August of 2018, the ALJ issued an adverse decision in which he found all of Plaintiff's impairments to be non-severe, and therefore, the ALJ found Plaintiff not disabled at Step Two. *Id*. at 17-24. Specifically, the ALJ found that Plaintiff's migraine illness was medically determinable; however, without so much as mentioning the findings and opinions of Dr. Sims, the ALJ simply dismissed the entirety of the medical evidence of Plaintiff's migraine illness by stating that the medical records themselves were dated "from either prior to the alleged onset date, or after the date last insured," and that Plaintiff's testimony was, by itself, "insufficient" for a disability finding. *Id*. at 20-21. The ALJ appears to have employed some circular logic in order to theorize that Plaintiff's headaches were caused by the opiate medications that had been prescribed to treat the headaches themselves, and that Plaintiff's migraine illness was in fact caused by a narcotic dependency. *Id*. at 22. In support of this theory, the ALJ only cited to a progress note from a hospital visit in September of 2015, during which Dr. Cho opined that it may be possible that Plaintiff's migraine illness might improve if her medicinal regimen were changed from "abortive" medications that were designed to abate the pain associated with her headaches, to "preventive" medications. *See id*. at 502. However, nowhere in this progress note, nor any of the associated treatment records, is there any indication that Dr. Cho or any other physician had formed an opinion that Plaintiff's migraine illness was rooted in the medications that her physicians had prescribed to treat the illness itself. Indeed, because Plaintiff's physicians spent years using a trial and error approach to treating her migraines, which they consistently noted as being hormonal in origin, Dr. Cho's progress note from September of 2015 actually stated that "[p]reventive medications tried are Nortriptyline Prozac [and were] not much help." *Id*. Further, the ALJ opined that Plaintiff's migraine illness would simply go away if she were to discontinue her prescribed medications and replace them with Botox injections. *Id*. at 22. However, the ALJ's opinion failed to take note of the fact that Dr. Cho had in fact surmised that "[B]otox is an option but not a good option." *Id*. at 205. Once again, without even so much as a mention of the findings and conclusions expressed by Dr. Sims, the ALJ discounted the entirety of Plaintiff's testimony by

4

merely stating that "the documentary medical evidence from the relevant period does not objectively support such severity or frequency [of migraine symptoms]." *Id*. at 23. In the end, the ALJ found Plaintiff not disabled at Step Two by concluding that due to the "lack of medical evidence," Plaintiff experienced no limitations at all in any area of functioning. *Id*. at 24.

Given that the trial and error approach to treating her migraine illness had proved ineffective, Plaintiff sought treatment from Susan Hutchinson, M.D., a neurologist who specializes in headache medicine and women's issues with regards to migraine treatment. *Id*. at 29-32. In support of Plaintiff's application for disability benefits, Dr. Hutchinson submitted a letter, dated November 18, 2018, in which she explained the etiology of Plaintiff's migraine illness, as well as why Plaintiff's condition had been largely misunderstood by her earlier treatment providers. *Id*. Initially, Dr. Hutchinson noted that she has been certified as a specialist in headache medicine by the Council for Neurologic Subspecialties since 2006, and that she has practiced primary care medicine with a special interest in women's health, hormones, and migraines for over twenty years. *Id*. at 29. In addition to being on staff at Hoag Hospital in Newport Beach, California, Dr. Hutchinson is also the founder and director of the Orange County Migraine and Headache Center in Irvine, California. *Id*. Further, in addition to participating in numerous headache research projects, co-authoring two books on migraines, authoring numerous articles in various medical journals on the subject, and lecturing nationally on the subject, Dr. Hutchinson served for 5 years as the chair for the women's issues section of the American Headache Society. *Id*.

Prior to reporting on Plaintiff's migraine illness, Dr. Hutchinson gathered evidence by performing a medical examination and reviewing all of Plaintiff's pertinent medical records. *Id*. Initially, Dr. Hutchinson noted that, since late 2014, Plaintiff has suffered migraine attacks between 10 and 20 days per month, and that "[m]ost of these migraine attacks are disabling, causing [Plaintiff] to be bedridden for hours due to severe throbbing head pain made worse by any motion, as well as nausea, photophobia, and phonophobia." *Id*. In those months where Plaintiff has 14 or few migraine attacks, her symptoms match the criteria for an episodic migraine illness, but in those months where she experiences more than 15 attacks, her condition meets the criteria for a chronic migraine illness. *Id*. Importantly, Dr. Hutchinson noted that while Plaintiff "does have

5

additional migraine triggers beyond those of a hormonal nature, her migraine pattern is consistent with a primary cause of menstrually related migraine (i.e. hormonal migraine) which has worsened in recent years due to perimenopause and, of late, early menopause . . . [and] [t]here is no indication that the disabling frequency or severity of [Plaintiff's] migraines is due to medication overuse." *Id*. at 30. Thus, as to Dr. Cho's musing notation that the etiology of Plaintiff's migraine illness may possibly be rooted in rebound from the medications themselves, Dr. Hutchinson disagreed and maintained that "[e]arlier diagnosis to that effect overlooked the more obvious reason for the worsening of [Plaintiff's] migraines in recent years, i.e. her progression through perimenopause and early menopause in combination with her long history of hormone migraine." *Id*. Dr. Hutchinson then added that menstrual-related migraine illness (which includes all hormonally-triggered migraines) is more severe and more difficult to treat than other types of migraines, and that "hormonal migraine attacks are typically longer, more severe, less likely to respond to treatment, more likely to recur, and more disabling." *Id*.

Noting the disagreement within the neurologist and headache specialist community about the validity and applicability of diagnoses of rebound headaches, also known as medication overuse headaches ("MOH"), Dr. Hutchinson explained that recent scholarship has made it clear that "the data supporting MOH, such as exists, is weak and has frequently been incorrectly evaluated, leading to overly broad and inappropriate application of the MOH diagnosis." *Id*. In short, Dr. Hutchinson maintained that earlier diagnoses suggesting that Plaintiff's migraines may have been rebound headaches caused by medication overuse appear to have fallen into that trap and that those diagnoses were unsupported by the facts of Plaintiff's case because "there is no evidence that [Plaintiff's] condition is related to or has been caused by medication overuse." *Id*. In fact, Dr. Hutchinson opined that, in 2015, when one of Plaintiff's earlier doctors refused to consider the prophylactic use of a preventative dose of frovatripan (which Plaintiff herself had suggested), that her doctors "missed a valuable opportunity to attempt a preventive regimen that might have allowed [Plaintiff] to avoid significant suffering and disability." *Id*. As to Dr. Cho's recommendation that Plaintiff consider migraine prophylaxis with Botox, amitriptyline, nortriptyline, Topamax, or the antiepileptic medication Depakote, Dr. Hutchinson explained that

"in the context of [Plaintiff's] sensitivities and comorbidities, none of those approaches is likely to have succeeded in providing a significant long-term reduction in her migraine frequency and severity . . . [m]eanwhile each of those approaches carries significant risk or short-term and, potentially, long-term adverse effects." *Id*. at 31. Specifically, Dr. Hutchinson explained that Botox would have been particularly unsuitable due to the fact that "the mean reduction in migraine frequency [using Botox] is typically superior to placebo by only 1-2 days per month." *Id*. Amitriptyline and nortriptyline, being in the same pharmacological family, would have been equally unsuitable because Plaintiff had already used this medication with little to no benefit at low doses for over 12 years, and that Plaintiff was unable to tolerate higher doses. *Id*. Likewise, Dr. Hutchinson noted that Topamax would have been similarly ineffective because it is poorly tolerated as a long-term medication, and also because a double-blind placebo-controlled trial showed that Topamax only provides a mean reduction in migraine frequency of about 1 day per month relative to a placebo. *Id*. Lastly, Dr. Hutchinson explained that the antiepileptic medication Depakote would be similarly unsuitable because its mean reduction in monthly migraine frequency was less than 1 day per month relative to a placebo while presenting significant long-term adverse effects such as liver toxicity, GI issues (to which Plaintiff is particularly sensitive), dizziness, fatigue, tremor, and other systemic issues. *Id*.

Because of the severe pain associated with Plaintiff's migraine illness, Dr. Hutchinson noted that it was entirely appropriate for her previous doctors to prescribe hydrocodone-containing opioid medicines because failing to do so would have not only left Plaintiff in terrible pain, but it would have contributed to a worsening of her condition due to the spiraling effect of the pain on her migraine illness. *Id*. at 32. In this regard, Dr. Hutchinson specifically noted that Plaintiff's medical records and prescription history "clearly show that she has always used these medications in a manner commensurate with her medical condition . . . [with] no evidence of [Plaintiff] ever using opioids inappropriately[,] or ever inappropriately requesting opioids . . . placing her in the lowest risk category for risk of opioid abuse." *Id*. In conclusion, after noting that her previous doctors' diagnoses had not adequately factored in the predominantly hormonal component of her migraine illness[,] [and that] previous treatment recommendations were not appropriately tailored

to her specific biochemistry and comorbidities," Dr. Hutchinson added that she would be "working with [Plaintiff] to have her try some promising alternative approaches to migraine prevention and management which were not previously offered to her." *Id*. However, because "hormonal migraine is notoriously difficult to treat, [and because] there is no guarantee of success," Dr. Hutchinson expressed support for Plaintiff's claim for disability benefits while noting her conclusion that "there is no doubt that since late 2014, her migraine illness has been, and currently continues to be, disabling." *Id*.

Thus, by way of summary, Plaintiff's more recent primary care provider, Dr. Sims, treated Plaintiff for over two years, and in March of 2018, opined that Plaintiff's migraine illness was triggered by hormones (*see id*. at 1471) and that the condition rendered Plaintiff unable to function in any workplace for 5 or more days per month (*see id*. at 1477). Then, in November of 2018, Plaintiff's treating specialist, Dr. Hutchinson, rendered a concurring opinion that both contextualized and explained the limitations opinions expressed by Dr. Sims a few months earlier (*see id*. at 29-32). While the ALJ's decision (*see id*. at 17-24) failed to make any mention of any of the limitations opinions expressed by Dr. Sims in her medical source statement, the Appeals Council was likewise unmoved by Plaintiff's submission of Dr. Hutchinson's report and noted that, "[w]e find this evidence does not show a reasonable probability that it would change the outcome of the decision." *See id*. at 2. Thereafter, on April 1, 2019, the Appeals Council denied Plaintiff's request for review of the ALJ's decision which had found Plaintiff not disabled at Step Two by finding that her migraine illness was not severe because it was attended with no limitations in any area of work-related functioning. *See id*. at 1-3.

## DISCUSSION

The evaluation of claimed impairments at Step Two of the sequential evaluation process is a *de minimis* test intended to weed out the most minor of impairments, as well as functioning as a screening device to dispose of patently groundless claims. *See Bowen v. Yuckert*, 482 U.S. 137, 153-154 (1987); *Edlund v. Massanari*, 253 F.3d 1152, 1158 (9th Cir. 2005) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)); *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005). Thus, a finding of non-severity at Step Two must be "clearly established by medical evidence"

(*see id.*), and if a claimant meets her evidentiary burden under Step Two's *de minimis* standard, an ALJ "must find that the impairment is 'severe' and move to the next step" in the five-step evaluation process. *See Edlund*, 253 F.3d at 1160. For these reasons, "[a]mple authority cautions against a determination of nondisability at step two." *Ortiz v. Commissioner of Social Sec.*, 425 F. App'x 653, 655 (9th Cir. 2011) (citing *Yuckert*, 482 U.S. at 153; *Webb*, 433 F.3d at 686; and, *Smolen*, 80 F.3d at 1290).

In the present context, at Step Two of the evaluation process, the ALJ was bound by 20 C.F.R. § 404.1520a, which required a determination as to whether Plaintiff has a medically determinable impairment, a rating of the degree of functional limitation for four functional areas, and a determination as to the severity of the impairment and then, if severe, the ALJ will proceed to Step Three of the evaluation process. *See Keyser v. Commissioner of Social Sec.*, 648 F.3d 721 (9th Cir. 2011). Here, while the ALJ implemented this process, he arbitrarily decided that Plaintiff's migraines caused no limitations at all in any of the work-related areas of functioning, and, the ALJ did so without so much as a mention of the work-preclusive limitations opinions in each of these four functional areas as expressed by Dr. Sims. As to Dr. Hutchinson's opinion which served to contextualize and explain the opinions of Dr. Sims, it should be noted that the scope of the record before this court is determined by what evidence the Appeals Council considered, or should have considered. In cases where the Appeals Council considered new evidence in deciding whether to review an ALJ's decision, that evidence becomes part of the administrative record, which this court must consider when reviewing the Commissioner's final decision for substantial evidence. *See Brewes v. Commissioner of Social Sec.*, 682 F.3d 1157, 1163 (9th Cir. 2012). Thus, the Appeals Council must consider additional evidence that may be submitted if the evidence is both "new and material." *See* 20 C.F.R. 404.970 (b). In such cases, the Appeals Council should consider the entire record, including the new evidence, in order to determine if the ALJ's findings are "contrary to the weight of the evidence." *Id*. Evidence is considered material under 42 U.S.C. § 405(g) if it bears "directly and substantially on the matter in dispute," and there is a "reasonable possibility" that the new evidence would have changed the outcome. *See Mayes v. Massanari*, 276 F.3d 453, 462 (9th Cir. 2001). Here, the Appeals Council

did consider Dr. Hutchinson's letter and opinions but found that the additional information did not provide a basis for changing the ALJ's decision. *See AR* at 2. Accordingly, this court must consider the new evidence and evaluate the record as a whole. *See Ramirez v. Shalala*, 8 F.3d 1449, 1452 (9th Cir. 1993).

Having stated that the ALJ made no mention of Dr. Sims's opinion, it should now be noted that medical opinions are "distinguished by three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating provider is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017). In cases where a treating doctor's opinion is not controlling, the opinion is weighted according to factors such as the nature and extent of the treatment relationship, as well as the consistency of the opinion with the record. 20 C.F.R. § 404.1527(c)(2)-(6); *Revels*, 874 F.3d at 654.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Commissioner of Social Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id*. (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Further, "[t]he opinion of a

10

nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831; *see also Revels*, 874 F.3d at 654-55; *Widmark v. Barnhart*, 454 F.3d 1063, 1066-67 n.2 (9th Cir. 2006); *Morgan v. Commissioner of Social Sec.*, 169 F.3d 595, 602 (9th Cir. 1999); *see also Erickson v. Shalala*, 9 F.3d 813, 818 n.7 (9th Cir. 1993). In situations where a Plaintiff's condition progressively deteriorates, the most recent medical report is the most probative. *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986). Importantly, the opinions of specialists about medical issues related to their areas of specialization are entitled to greater weight. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."); *Revels*, 874 F.3d at 654; *see also Benecke v. Barnhart*, 379 F.3d 587, 594 n.4 (9th Cir. 2004) (A doctor's specialized knowledge is especially relevant with respect to conditions that are "poorly understood" within the rest of the medical community.).

Under these standards, the ALJ was required to provide (at the very least) specific and legitimate reasons for rejecting the opinions of Dr. Sims – and, having failed to mention Dr. Sims's opinions at all, the ALJ obviously failed to meet this standard. Likewise, because of the evidence that Plaintiff's migraine illness was progressively worsening, it was error for the ALJ to fail to afford controlling weight to Dr. Sims's more recently rendered opinion. Furthermore, because Dr. Hutchinson is a specialist in headache medicine and migraine treatment, it was error for the Commissioner to fail to give greater weight to her opinion – especially because Dr. Hutchinson's letter made it clear that she was rendering an opinion about a condition (a menstrually-related hormone-triggered migraine illness) that was poorly understood within the rest of the medical community. *See id*. Accordingly, because the Commissioner improperly rejected the opinions rendered by Drs. Sims and Hutchinson, those opinions will now be credited as true as a matter of law.

As to Plaintiff's testimony (which was entirely consistent with the limitations opined by Dr. Sims), it should be noted that when medically documented impairments reasonably could be expected to produce some degree of the symptoms complained of, and the record contains no

11

affirmative evidence of malingering, as was the case here, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen*, 80 F.3d at 1281. Thus, generalized assertions that the claimant is not credible are insufficient; instead, an ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). Here, the ALJ merely repeated the often-used boilerplate explanation that while Plaintiff's medically determinable impairments could have been reasonably expected to have perhaps produced some of the alleged symptoms, that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms "are not entirely consistent with the medical evidence and other evidence in the record." *See AR* at 23. As a number of courts have noted, boilerplate language of this sort fails to inform a reviewing court of the specific evidence the ALJ considered in determining that claimant's complaints were not credible, and furthermore, it fails to inform a reviewing court as to which portions of Plaintiff's testimony were credited and which portions were not. *See Laborin v. Berryhill*, 867 F.3d 1151, 1154-55 (9th Cir. 2017); *see also Brown-Hunter v. Colvin*, 806 F.3d 487, 489, 494 (9th Cir. 2015) (To discredit a claimant's symptom testimony when the claimant has provided objective medical evidence of the impairments which might reasonably produce the symptoms or pain alleged and there is no evidence of malingering, the ALJ must give "specific, clear, and convincing reasons for rejecting" the testimony by identifying "which testimony [the ALJ] found not credible" and explaining "which evidence contradicted that testimony."); *see also Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (noting that this boilerplate language "gets things backwards"); and, *Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015) (concluding the boilerplate language "gets things backwards by implying that ability to work is determined first and is then used to determine the claimant's credibility."). Thus, because the court finds that the ALJ's explanation for rejecting Plaintiff's pain and symptom testimony was neither clear nor convincing, that testimony will now be credited as true as a matter of law. Indeed, because the ALJ failed to discuss the opinions rendered by Dr. Sims, Defendant concedes that the ALJ's decision was unsupported by substantial evidence and that remand, in one form or another, is appropriate. *See* Def.'s Mot. (dkt. 26) at 5.

1   What remains for this court to determine is the nature of that remand – while Defendant submits
2   that further proceedings are required, Plaintiff submits that the record is complete and that further
3   proceedings would serve no useful purpose.

### *Nature of Remand*

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000), *cert. denied*, 531 U.S. 1038 (2000). The Court of Appeals for the Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Id*. Remand for an immediate award of benefits is appropriate when: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and, (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited. *Id*. The second and third prongs of the test often merge into a single question; that is, whether the ALJ would have to award benefits if the case were remanded for further proceedings. *Id*. at 1178 n.2; *see also Garrison v. Colvin*, 759 F.3d 995, 1021-23 (9th Cir. 2014) (when all three conditions of the credit-as-true rule are satisfied, and a careful review of the record discloses no reason to seriously doubt that a claimant is, in fact, disabled, a remand for a calculation and award of benefits is required). A reviewing court should decline to credit testimony and remand for an immediate award of benefits whenever "outstanding issues" require further proceedings. *See Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010); *see also Garrison*, 759 F.3d at 1020. In other words, even where all the conditions for the credit-as-true rule are met, courts retain "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id*. at 1021; *see also Dominguez v. Colvin*, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits."); *Treichler v. Commissioner of Social Sec.*, 775 F.3d 1090, 1105 (9th Cir. 2014) ("Where . . . an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency.");

1   *McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989) (remanding for further proceedings because the ALJ was in a better position than a reviewing court to point to pertinent evidence in record).

As mentioned above, while Defendant concedes that the ALJ's failure to even address the opinions of Dr. Sims constitutes an error justifying remand, Defendant submits that further proceedings are required because "[t]he record contain (sic) conflicting opinions, precluding an award of benefits." *See* Def.'s Mot. (dkt. 26) at 7, 10-11. The court disagrees, and finds that Defendant's assertions of conflict in the record are not such that would preclude an award of benefits because a review of the record as a whole does not give rise to any serious doubt that Plaintiff is in fact disabled. First, Defendant points to the fact that one of Plaintiff's earlier physicians, Dr. Joshi, who is an internal medicine doctor and not a specialist, had told Plaintiff during a phone call in February of 2015 that while Plaintiff was on 50 % work disability at the time, Dr. Joshi could not justify 100% disability due to migraines. *See id*. at 7 (citing *AR* at 519). However, this notation, stemming from a telephone encounter in 2015, is not the sort of conflict that either warrants further proceedings or gives rise to any serious doubt that Plaintiff is in fact disabled: (1) because Dr. Joshi is not a specialist in the area of headache medicine; (2) because Plaintiff's condition was progressively worsening during this period; (3) because Dr. Joshi's statement significantly predated the evaluations and opinions of Drs. Sims and Hutchinson; and (4) because the opinions of Drs. Sims and Hutchinson were due greater weight because those work-preclusive opinions were rendered by specialists in a field (menstrually-related hormone-triggered migraine illness) that is poorly understood within the rest of the medical community. Indeed, as described by Dr. Hutchinson, Plaintiff's earlier doctors (including Dr. Joshi) had not adequately factored in the predominantly hormonal component of her migraine illness, thus, previous treatment recommendations were not appropriately tailored to Plaintiff's specific biochemistry and comorbidities. *See AR* at 32. Accordingly, the court finds that Defendant's assertion of a record-based conflict, based on Dr. Joshi's notation about 100% disability, is not the sort of indicator that gives rise to any serious doubts that Plaintiff is in fact disabled such that further administrative proceedings would be required.

14

Next, Defendant submits that a record-based conflict is also manifest in the 2017 opinion of a non-examining state agency consultant, Dr. Kiger, because of the notion that he "reviewed the records and opined that Plaintiff's migraines were not presumptively disabling." *See* Def.'s Mot. (dkt. 26) at 7. First, Dr. Kiger did not have the benefit of reviewing the later-rendered opinions of Drs. Sims and Hutchinson, and when Dr. Kiger stated that it did not appear that Plaintiff's migraine illness was "sufficiently limiting to equal a listing," it was with the qualification that the evidence of record was, at the time, not sufficient to assess an RFC. *See AR* at 135. In any event, Dr. Kiger's 2017 statement that it did not appear that Plaintiff's headaches "were sufficiently limiting to equal a listing," neither conflicts with Dr. Sim's opinion that Plaintiff's hormonally triggered migraines will cause her to be absent from any employment for more than five days per month, nor does it otherwise detract from any of the work-preclusive conclusions or opinions rendered by Drs. Sims or Hutchinson. Thus, the court finds no merit in Defendant's suggestion that "[t]his conflict alone precludes an award of benefits." *See* Def.'s Mot. (dkt. 26) at 7.

Defendant's next argument is that further proceedings are required because the record contains evidence that Plaintiff disagreed with some of her earlier doctors about how to alter the course of treatment for her migraines which had been resistant to treatment and which her previous doctors had misdiagnosed as rebound headaches due to medication overuse. *See id*. at 8. However, Defendant's argument in this regard is likewise unpersuasive because, as discussed above, Dr. Hutchinson explained that Plaintiff's previous doctors had misdiagnosed the root cause of her migraine illness as well as its consequential resistance to treatment, noting that there was no evidence that the migraine illness was caused by medication overuse. Given the length of Plaintiff's treatment relationship with Dr. Sims (well over two years), and given the fact that Dr. Hutchinson is a specialist in a field that is poorly understood within the rest of the medical community; the opinions of Drs. Sims and Hutchinson were due greater weight as a matter of law. *See Benecke*, 379 F.3d at 594 n.4 (A doctor's specialized knowledge is especially relevant with respect to conditions that are "poorly understood" within the rest of the medical community.). Accordingly, Defendant's suggestion that the misdiagnoses and misunderstandings of Plaintiff's migraine illness by her earlier doctors constitute "conflicts" that require further proceedings to

15

allow the ALJ to reconcile those opinions with the opinions of Drs. Sims and Hutchinson is unpersuasive because, under the standards described above, on remand the ALJ would be required to give controlling weight to the opinions of Drs. Sims and Hutchinson and find Plaintiff disabled based on the VE's testimony to the effect that there is no work in the national economy for any person who would be likely to miss as little as four days of work in an average month. *See AR* at 119-20.

Next, Defendant submits that medical records from 2015 reflect that Plaintiff told her doctors that she previously went to the gym three times a week and danced two times a week; thus, Defendant contends that "[e]xercising five times a week for much of the relevant period is inconsistent with debilitating migraines 10-15 days a week (sic), or at the very least creates an outstanding issue that should be developed on remand." *See* Def.'s Mot. (dkt. 26) at 9. The notation to which Defendant refers appears on a medical intake form that inquired about Plaintiff's exercise habits, and merely noted, "previously gym 3x/week, dancing 2x/week, but has been off for injury past 2 months." *AR* at 487. However, this isolated notation does not rise to the level of creating the sort of conflict or outstanding issue that would require further proceedings as it neither raises any serious doubt that Plaintiff is in fact disabled based on the combination of the VE's testimony and the opinions of Drs. Sims and Hutchinson, nor independently constitutes an ambiguity that needs to be developed through further proceedings. Instead, the court finds that this notation, from November of 2015, is inconsequential and that Defendant has seized upon it as a justification for further proceedings to no avail.

In short, Defendant submits that a remand for further proceedings "would allow the ALJ to evaluate the (sic) Dr. Sim's unaddressed opinion and the opinion [of Dr. Hutchinson] submitted to the Appeals Council, and resolve any conflicts in the evidence between those opinions and Dr. Joshi's opinion, Plaintiff's activity level, Dr. Kiger's opinion, and her reluctance to follow Dr. Cho's medical advice to take [certain] prophylactic medication[s]." *See* Def.'s Mot. (dkt. 26). However, for the reasons described above, none of the issues identified by Defendant represent any issues that require further record development, or any real conflicts that might cast any doubt at all on the reality that further administrative proceedings would serve no useful purpose because

16

on remand the ALJ would clearly be required to find Plaintiff disabled under the standards described above.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 29) is **GRANTED**, and Defendants' Motion for Remand for Further Proceedings (dkt. 26) is **DENIED**. Accordingly, the court **REVERSES** the decision of the Commissioner and **REMANDS** this matter for the immediate calculation and award of benefits.

**IT IS SO ORDERED.**

Dated: September 3, 2020

ROBERT M. ILLMAN
United States Magistrate Judge